UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

NICHOLAS HARRISON and
OUTSERVE-SLDN, INC.

    Plaintiffs,

          v.

JAMES N. MATTIS, in his official capacity
as Secretary of Defense; MARK ESPER, in
his official capacity as the Secretary of the
Army; and the UNITED STATES
DEPARTMENT OF DEFENSE,

    Defendants.

Case No. _1:18cv641_ (LMB/IDD)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Nicholas ("Nick") Harrison and OutServe-SLDN, Inc. ("Plaintiffs"), by and through their attorneys, hereby bring this action for declaratory and injunctive relief against Defendants James Mattis, in his official capacity as the Secretary of Defense; Mark Esper, in his official capacity as the Secretary of the Army; and the United States Department of Defense ("Defendants"), challenging current military policies that discriminate against people living with the human immunodeficiency virus (HIV).

## STATEMENT OF THE CASE

1.    For over thirty years, the military has placed broad restrictions on the service of people living with HIV.  Military regulations prohibit the enlistment or commissioning of any individual living with HIV and place strict geographic limitations on the service of members who first test HIV positive while on active duty.  This action challenges the constitutionality of these

regulations that exclude or limit the military service of people living with HIV in light of medical advancements rendering this diagnosis irrelevant to their ability to serve.

2.      Scientific innovation and medical advances have radically changed the landscape of HIV treatment and prevention—as well as the ramifications of an HIV diagnosis and prognosis for people living with this condition.  Antiretroviral medications first developed in the mid-1990s prevent replication of the virus in a person's bloodstream, halting progression of the disease and allowing the person's immune system to resume normal functioning.  Shortly after the introduction of antiretroviral therapy, medical researchers discovered that treatment of an HIV-negative person with the same medications before or after an exposure generally prevents an HIV infection from taking hold.  As treatment with antiretroviral medications was refined over the following decade, researchers also discovered that those in successful treatment are incapable of transmitting HIV—a tremendous boon to prevention and overall public health.

3.      These medical advances should have resulted in an overhaul of military policies related to people living with HIV.  Instead, the Department of Defense and the Army maintained the bar to enlistment and appointment of people living with HIV, as well as the restrictions on deployment, when they revisited these policies in recent years.

4.      Plaintiff Nick Harrison ran headlong into these policies in his quest to become a Judge Advocate General for the D.C. National Guard.  After two tours of duty in the Middle East, Sgt. Harrison was diagnosed with HIV at about the same time that he passed the bar exam. Shortly after starting antiretroviral therapy, Sgt. Harrison's HIV was completely under control; his physical capabilities were never affected in any way.  A few years later, when he was selected to fill a position as an attorney in the Judge Advocate General Corps for the D.C. National Guard, Sgt. Harrison discovered that outdated military policies regarding people living

2

with HIV would prevent him from being commissioned as an officer and from filling this position based in Arlington, Virginia.

5.     The military's outdated policies severely curtailing the service of people living with HIV are a violation of the equal protection guarantees of the U.S. Constitution. To make matters worse, the Department of Defense has recently issued guidance directing that all service members who are not considered worldwide deployable—which arguably is all service members living with HIV—for 12 consecutive months should be separated from military service.  In spite of the military's irrational restrictions, hundreds of individuals living with HIV—including Plaintiff Nick Harrison—have served honorably in the armed services after being diagnosed with HIV.  If the military is not required to re-examine its recruitment, retention, and promotion policies and to bring them in compliance with the U.S. Constitution's guarantee of equal protection of the laws, these individuals will be forced out of the military and countless others will never have the opportunity to serve their country, based solely on their HIV status.

**PARTIES**

6.     Plaintiff Sergeant Nick Harrison is a 41-year-old man living in Washington, D.C. He has been serving in the military for approximately eighteen years.  Sgt. Harrison has been living with HIV since 2012.

7.     Plaintiff OutServe-SLDN, Inc., formed through the merger of OutServe and the Servicemembers Legal Defense Network, is a nationwide, non-partisan, non-profit, legal services, watchdog and policy organization dedicated to bringing about full equality to America's military and to ending all forms of discrimination and harassment on the basis of HIV status, sexual orientation, and gender identity.  OutServe-SLDN provides pro-bono advocacy and legal

services for members of the military living with HIV, as well as members of the military who are LGBTQ.

8.      Defendant Secretary James N. Mattis is the Secretary of the U.S. Department of Defense.  He is ultimately responsible for the administration and enforcement of the Department's service restrictions on people living with HIV, including the accessions bar for people living with HIV.

9.      Defendant Mark Esper is the Secretary of the Army.  As Secretary of the Army, he has command authority over the District of Columbia Army National Guard.  He is ultimately responsible for the administration and enforcement of the regulations, both Department of Defense Instructions (DoDI) and Army Regulations (AR), within the Army and National Guard, and is therefore ultimately responsible for the administration and enforcement of the Department of the Army's regulations regarding service members living with HIV.

10.     The U.S. Department of Defense is an executive branch department of the U.S. federal government comprising the office of the Secretary of Defense; the Joint Chiefs of Staff; the Joint Staff; the Departments of the Army, Navy, and Air Force; the unified and specified combatant commands; such other offices, agencies, activities, and commands as may be established or designated by the President or by law; and all offices, agencies, activities, and commands under any of their control or supervision.  Under the direction of Secretary Mattis, the Department of Defense is also responsible for administration and enforcement of the Department's service restrictions on people living with HIV.

## JURISDICTION AND VENUE

11.     Subject matter jurisdiction exists under 28 U.S.C. § 1331 because this action arises under, is founded upon, and seeks to redress the deprivation of rights secured by the United States Constitution.

12.     Venue is proper in the Eastern District of Virginia under 28 U.S.C. § 1391(e).  On information and belief, a substantial portion of the events or omissions that gave rise to Plaintiff's claim occurred in the Eastern District of Virginia.

13.     This court has personal jurisdiction over Defendants because their enforcement of the service restrictions and the accessions bar for people living with HIV occurs within the Eastern District of Virginia.  Furthermore, the application of the service restrictions prevented Plaintiff Nick Harrison from taking a post in Arlington, VA, and it was foreseeable that the application of those requirements as to Sgt. Harrison would have an impact in this district.

## FACTUAL ALLEGATIONS

**Background Information Regarding HIV**

14.     The landscape of HIV treatment and prevention, the ramifications of an HIV diagnosis, and the prognosis for people living with HIV have all changed dramatically since the virus was first identified as the cause of Acquired Immune Deficiency Syndrome (AIDS) in the 1980s.

15.     After gaining a foothold in the blood, the human immunodeficiency virus replicates within the cells of the body's immune system and targets CD4 T-cells for destruction. CD4 T-cells are critical to the human body's ability to fight infections.

16.     If untreated, the virus replicates and multiplies to levels that allow it to reduce the quantity of CD4 T-cells, and the body becomes progressively more prone to illness.  If left

untreated over a period of years, a person's immune system can become so compromised that infections and conditions the body normally is able to fend off easily can take hold.  These are known as "opportunistic infections."

17.     A person with fewer than 200 CD4 T-cells per milliliter of blood simultaneously with an opportunistic infection has progressed to the third stage of the disease and has an AIDS diagnosis.

18.     Until 1996, although progressing at different rates after being diagnosed, people with HIV all had a terminal condition.

19.     In 1996, everything changed.  The advent of new antiretroviral medications to prevent the virus from replicating—used in combinations of three or four to prevent the ability of the virus to mutate and circumvent a single medication—transformed the landscape of HIV treatment and prevention and radically shifted health outcomes for people living with HIV.

20.     The effectiveness of these antiretroviral medications is measured by the reduction in the number of copies of the virus in a milliliter of a person's blood, which is referred to as the "viral load."  While a person in the acute or secondary stage of infection could have a viral load of 1 million or more, a person in successful treatment will have a viral load of less than 200, which is considered "virally suppressed," or a viral load of less than 48-50, which is referred to as an "undetectable" viral load.  (Current testing technologies are sensitive enough to detect lower levels of virus in the blood, but the nomenclature of "undetectable" is still applied to test results of less than 48-50 copies per milliliter of blood, which reflected the limit of sensitivity for earlier HIV testing technologies.)

21.     With adherence to these new medications, people living with HIV are able to live in good health.  Patients with an AIDS diagnosis—sometimes with a CD4 count of as low as

one—were literally brought back from the brink of death and restored to health through antiretroviral combination therapy.  As the number of copies of HIV in a person's system was reduced, CD4 T-cells counts grew and the immune system's ability to fight off opportunistic infections was restored.  For the first time, an AIDS diagnosis could be reversed.

22.     Over time, researchers and clinicians were able to refine the use of these pharmaceuticals to make treatment adherence easier and health outcomes even better.  Three (or four) medications were combined into one tablet that a person could take once a day (known as a "single tablet regimen" or STR) with no reduction in effectiveness.  Though the side effects of the initial antiretroviral medications were generally tolerable, researchers developed new medications that had few or no discernible side effects for most people.  The standard practice of waiting to provide antiretroviral medications until a patient began showing signs of immune system deterioration was modified to starting treatment with antiretroviral medications almost immediately after diagnosis, a recognition that the benefits of treatment far outweighed any negative consequences of being on these medications.

23.     Today, though still incurable, HIV is a chronic, manageable condition rather than the terminal diagnosis it once was.  In fact, a 25-year-old who is timely diagnosed and provided appropriate treatment has a life expectancy within four to six months of a 25-year-old who does not have HIV.

24.     Furthermore, medical researchers have now established that a person with a suppressed viral load is incapable of transmitting HIV.  Contrary to popular belief, even without viral suppression, HIV is not that easily transmitted.  The Centers for Disease Control and Prevention (CDC) estimates that, in the absence of treatment or other preventive measures, such as condom use, the risk of HIV transmission through a single act of receptive anal sex—the

riskiest sexual activity—is approximately 1.38%.  *See* Centers for Disease Control and Prevention, *HIV Risk Behaviors: Estimated Per-Act Probability of Acquiring HIV from an Infected Source, by Exposure Act*, www.cdc.gov/hiv/risk/estimates/riskbehaviors.html (last updated Dec. 4, 2015).  The per-act risk of transmission for other sexual activities is between zero and .08%.  And *with adherence to HIV medications and the resulting viral suppression, the risk of transmission is essentially zero for any sexual activity.  See* Centers for Disease Control and Prevention, *Treatment as Prevention*, www.cdc.gov/hiv/risk/art/ (last updated May 7, 2018).  Antiretroviral treatment therefore not only dramatically improves personal health outcomes, but also improves public health outcomes by reducing transmission and the number of new cases.

25.     Transmission of HIV is extremely rare outside of the context of sexual activity, sharing of injection drug equipment, blood transfusion, needle sticks, or perinatal exposure (including breastfeeding).  For all other activities—including biting, spitting, and throwing of body fluids—the CDC characterizes the risk as "negligible" and further states that "HIV transmission through these exposure routes is technically possible but unlikely and not well documented."  *See* Centers for Disease Control and Prevention, *HIV Risk Behaviors: Estimated Per-Act Probability of Acquiring HIV from an Infected Source, by Exposure Act*, www.cdc.gov/hiv/risk/estimates/riskbehaviors.html (last updated Dec. 4, 2015).  The theoretical possibility of HIV transmission in these other contexts is eliminated entirely by adherence to medications and the viral suppression that results.

26.     Despite the tremendous breakthroughs in the treatment and prevention of HIV, people living with HIV continue to be subjected to stigma, ostracism, and discrimination rooted in misconceptions, fear, and ignorance that are deeply rooted in the psyche of the American public.

**Current Military Regulations Regarding HIV**

27.     In 1991, five years before the advent of effective antiretroviral combination therapy, the Department of Defense issued its first version of Instruction 6485.01. See Dep't of Defense, Instruction No. 6485.01 (June 7, 2013), http://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/648501p.pdf  ("DoDI 6485.01"), which elucidated the Department's policies with respect to people living with HIV.

28.     DoDI 6485.01 officially made people living with HIV ineligible for appointment, enlistment, pre-appointment, or initial entry training for military service.  Though this Instruction regarding "HIV in Military Service Members" has been adjusted and tweaked in various ways over the years, these core policies regarding enlistment and appointment have remained the same since 1991.

29.     Service members who first test HIV positive while on active duty are permitted to continue serving "in a manner that ensures access to appropriate medical care." DoDI 6485.01, Encl. 3, ¶ 2.c.  Except for the Navy, which under some circumstances allows deployment to foreign bases and select vessels, the other branches of the armed services have interpreted DoDI 6485.01 as requiring stationing of service members living with HIV strictly within the continental United States.

30.     Lending support to those interpretations of DoDI 6485.01, Department of Defense Instruction 6490.07 specifically identifies HIV as a medical condition that limits a service member's deployability.  Dep't of Defense, Instruction No. 6490.07 (Feb. 5, 2010), https://www.dcms.uscg.mil/Portals/10/CG-1/cg112/cg1121/docs/pdf/MedicalConditionsDeployments.pdf ("DoDI 6490.07").  Under DoDI 6490.07, a service member living with HIV should not be deployed on a "contingency

deployment" (*i.e.*, located outside the continental United States) unless a medical waiver is granted after consultation with the Combatant Command surgeon.  *See* DoDI 6490.07, Encl. 3, ¶ e (2).

31.     Army Regulation 600-110, *Identification, Surveillance, and Administration of Personnel Infected with Human Immunodeficiency Virus* (Apr. 22, 2014) https://www.army.mil/e2/downloads/rv7/r2/policydocs/r600_110.pdf  ("AR 600-110") is the Department of the Army's implementation of DoDI 6485.01.  It includes rules for both active duty Army and Army Reserve/National Guard service members.

32.     AR 600-110 implements a blanket prohibition on the accession of individuals living with HIV.  *See* AR 600-110, ch. 1-16.a and ch. 5.  The Regulation defines "accession" as enlistment in either the Army or Reserves, appointment as a West Point cadet, or one's first appointment as a commissioned officer in either the Army or Reserves.  *See* AR 600-110, ch. 5.2.a.

33.     AR 600-110 also implements the deployment restrictions on service members who seroconvert while on active duty.  Absent a medical waiver, service members living with HIV may be stationed only in the continental United States, Alaska, Hawaii, Guam, Puerto Rico, or the U.S. Virgin Islands.  *See* AR 600-110, ch. 1-16.f. On information and belief, waivers of this deployment restriction are granted rarely, if ever.

34.     Service members living with HIV may be separated medically if they "demonstrate progressive clinical illness or immunological deficiency as determined by medical authorities."  AR 600-110, ch. 6-15.  However, under AR 600-110, a service member cannot be discharged from the Army or Army Reserves solely because of their HIV-positive status.  *See id.*, ch. 1-16.e.

35.     An enlisted service member who is seeking a first commission as an officer must meet the Army's accession standards.

36.     The Department of Defense provides appropriate health care to all active duty service members, including new recruits, enlisted personnel, officers and those in training at service academies, as well as members of the National Guard.

37.     The Department of Defense recently issued interim policy guidance via a memo that has made it effectively impossible for people living with HIV to serve their country as members of the military.  Dep't of Defense, *Interim Guidance: DoD Retention Policy for Non-Deployable Service Members* (Feb. 14, 2018)

https://www.defense.gov/Portals/1/Documents/pubs/DoD-Universal-Retention-Policy.pdf

("Retention Policy").  On February 14, 2018, the Department of Defense issued a memo announcing a new policy applicable to non-deployable service members.  According to the new Retention Policy, service members who have been classified as non-deployable for more than 12 consecutive months shall be discharged absent a waiver.  The Retention Policy is based on "the underlying premise that all Service members are expected to be world-wide deployable."  Under the regulations of both the Department of Defense and the Department of the Army, all service members living with HIV currently serving in the Army are by default non-deployable.  On information and belief, the same is true for every other branch of the Armed Forces.

38.     The Retention Policy, in tandem with existing Department of Defense Instructions and Army Regulations, creates a *de facto* prohibition against individuals living with HIV serving in the Army, absent a special waiver allowing them to deploy.

39.     In fact, the Retention Policy, in tandem with existing instructions and regulations, creates a *de facto* prohibition against individuals living with HIV serving in any branch of the armed forces in any capacity, absent a special waiver allowing them to deploy.

**Plaintiff Nick Harrison's Quest to Become an Officer in the JAG Corps**

40.     Plaintiff Nicholas Harrison has had a long and honorable career in the armed services.  Originally from Oklahoma, he joined the U.S. Army in 2000, at the age of 23, and after basic training, spent three years stationed in Alaska.

41.     In 2003, Sgt. Harrison was discharged from active duty and joined the Army Reserves, returning to Oklahoma to become a member of the Oklahoma National Guard and to focus on his education.

42.     In 2005, Sgt. Harrison received a bachelor's degree from the University of Central Oklahoma and enrolled in law school at Oklahoma City University later that year. By the end of his first semester of law school, Sgt. Harrison was the top student in his class.

43.     Sgt. Harrison's legal education was interrupted, however, when his National Guard unit deployed to Afghanistan for sixteen months starting in March 2006.  In Afghanistan, a combat zone at the time, Sgt. Harrison's unit deployed in support of Operation Enduring Freedom.  Sgt. Harrison was recognized for his meritorious service with the Army Commendation Medal.

44.     When he returned from active duty, Sgt. Harrison was able to secure a transfer to the University of Oklahoma College of Law, but it required repeating his entire first year, because he had not completed the second semester at Oklahoma City University before deploying to Afghanistan.

45.     Undeterred by this additional hurdle, Sgt. Harrison matriculated to the University of Oklahoma, continued to perform well academically, and received both his J.D. and his M.B.A. from there in 2011.  Both his undergraduate and graduate degrees were financed almost exclusively by the Army.

46.     Before he was able to sit for the bar, however, Sgt. Harrison was deployed for a second tour of duty in 2011, this time to Kuwait.  In Kuwait, his unit was engaged in security for convoys withdrawing from Iraq.

47.     Shortly after returning from his second tour of duty in 2012, Sgt. Harrison was diagnosed with HIV at an Army medical facility after preliminarily testing HIV positive at an offsite testing location.

48.     Sgt. Harrison was immediately placed on antiretroviral combination therapy, and soon thereafter, he had an undetectable viral load.  He has been virally suppressed or had an undetectable viral load ever since that time.

49.     After Sgt. Harrison passed the Oklahoma bar exam, Colonel Elliot of the Oklahoma National Guard offered him a position as a Judge Advocate General (JAG) officer for the Oklahoma National Guard.  At nearly the same time, Sgt. Harrison was offered a coveted position as a Presidential Management Fellow in Washington, D.C.

50.     Because he could not do both (though he offered to attempt to do so by commuting from Washington, D.C. to Oklahoma for his duty weekends), Sgt. Harrison moved to Washington, D.C., transferred to the D.C. National Guard, and engaged in the Presidential Management Fellow (PMF) program.

51.     While living in Washington, D.C. and serving in the PMF program in 2013, Sgt. Harrison applied for a position in the Judge Advocate General's office for the D.C. National

Guard.  After a relatively short application and interview process, Harrison was chosen for an open position in the JAG Corps for the D.C. National Guard.  Impressed with his experience stationed in combat zones overseas, the recruiters at the D.C. National Guard informed Sgt. Harrison he would be commissioned with the rank of captain.

52.     Unlike regular members of the JAG Corps, who are commissioned as officers before being stationed, applicants for JAG positions with the National Guard are assessed and qualified as officers after securing a particular position.  In keeping with that policy and practice, Sgt. Harrison began the process of assessment and qualification with the assistance of First Lieutenant Nicole Ono, the Regional Specialty Branch Recruiter in the recruitment office of the D.C. National Guard.

53.     During his commissioning medical exam, conducted in March 2014, Sgt. Harrison received the top rating in every category.  Referred to as the PULHES score (shorthand for its testing categories: Physical stamina, Upper extremities, Lower extremities, Hearing/ears, Eyes, and Psychiatric), Sgt. Harrison received the best possible score: *i.e.*, a rating of one (on a scale of one to four) in every category.  Nonetheless, he was classified as "non-deployable" based on his HIV status.

54.      First Lt. Ono and Sgt. Harrison determined that Sgt. Harrison would need to seek a medical waiver regarding his HIV status to commission as an officer.  Sgt. Harrison provided the necessary materials for the waiver application to First Lt. Ono, who submitted them through the appropriate channels.

55.     After approximately five months, Sgt. Harrison's waiver application was denied by the Chief Surgeon of the Army National Guard via a memorandum dated December 30, 2014.

14

56.     If a medical waiver is denied, the next available option is to submit a request for an exception to policy ("ETP") from the appropriate level of authority.  Having been denied a medical waiver, Sgt. Harrison wrote a memorandum letter to the Under Secretary of Defense for Personnel and Readiness, routed through the Army Deputy Chief of Staff (G-1), seeking an ETP allowing him to commission.

57.     On March 19, 2015, Sgt. Harrison received a response from the Office of the Assistant Secretary of Defense for Readiness and Force Management, to whom the Under Secretary had delegated the responsibility of responding, identifying the relevant regulations that prohibited him from serving, but not explicitly denying his ETP request.

58.     Sgt. Harrison's request for an ETP was forwarded to Lt. Col. Conreau Williams, Chief Health Promotions Officer, in the Office of the Deputy Chief of Staff, G-1.  In an email dated March 24, 2015, Lt. Col. Williams offered to assist Sgt. Harrison with his ETP request.

59.     Sgt. Harrison pulled together all of the necessary materials to support his request for an ETP, and Lt. Col. Williams submitted the ETP packet for approval to the Office of the Army Surgeon General.

60.     After securing the necessary approval from the Office of the Army Surgeon General, the process included legal review by the Office of the Judge Advocate General before submission to the Deputy Chief of Staff for the Army (G-1) for approval or disapproval.

61.     However, it was determined that prior to legal review and submission to the Deputy Chief of Staff, Sgt. Harrison would need to secure sign-off for the ETP request at each level of his chain of command.  Sgt. Harrison secured the necessary sign-off at every level, and the ETP packet was submitted to the Deputy Chief of Staff for the Army (G-1) for approval in the first week of December 2015.

15

62.    On June 29, 2016, the Deputy Chief of Staff for the Army denied Sgt. Harrison's request, giving no explanation other than that the request was "not in the best interest of the Army."

63.    On July 21, 2016, Sgt. Harrison elevated his request to the Under Secretary of Defense for Personnel and Readiness.  His ETP request was denied by the Under Secretary on July 26, 2016, citing the Department of Defense Instructions and Army Regulations regarding accessions and people living with HIV as the reason for the denial.

64.    Sgt. Harrison subsequently submitted an application for review and correction to the Army Board for the Correction of Military Records (ABCMR).  Harrison was informed by the Army Review Boards Agency on March 17, 2017, that it is currently taking a year or more for cases to be completed for presentation to the ABCMR.  As of this filing, Sgt. Harrison has not received a disposition of his application before the ABCMR.

65.    Sgt. Harrison is now 41 years old, and the JAG Corps requires that a newly-commissioned JAG officer be able to complete 20 years of active duty as a commissioned officer before reaching the age of 62.  For most people, this means they must commission before the age of 42.

66.    If Sgt. Harrison had not run up against the accessions bar for people living with HIV and had instead been qualified in the normal course, he would have commissioned as an officer in the JAG Corps for the D.C. National Guard in or about September 2014.  This was approximately four and a half years before Sgt. Harrison would reach the age of 42.

67.    Based on prior years of active duty service, the Army often waives the age restriction and raises the age limit for accession as an officer accordingly.  As of the date of this

filing, Sgt. Harrison has accrued approximately five years of active duty service, which would raise to 47 the age by which he would need to commission as a JAG Corps officer.

68.     Sgt. Harrison is a member of OutServe-SLDN.

69.     OutServe-SLDN has over 7,000 members—veterans, active-duty service members, and civilian Department of Defense workers throughout the world who identify as LGBTQ or are living with HIV—and more than 54,000 supporters.  It operates more than 54 chapters worldwide, including 35 in the United States covering every region of the country. It has 20 additional special group forums, one of which is the "Positive Forum" for people living with HIV.

70.     In this action, OutServe-SLDN represents the interest of its members currently living with HIV, including Sgt. Harrison, as well as those who may acquire HIV in the future, and therefore are or will be adversely affected by the challenged regulations and policies.

## CAUSE OF ACTION
## VIOLATION OF EQUAL PROTECTION
### (Facial and As-Applied Challenge)

71.     The Fifth Amendment to the United States Constitution provides that no person shall be deprived of life, liberty, or property without due process of law.  The Due Process Clause includes within it a prohibition against the denial of equal protection by the federal government, its agencies, its officials or its employees.

72.     Defendants' accessions policies and practices discriminate impermissibly against people living with HIV both on their face and as applied by barring people living with HIV from enlistment in the military and appointment as an officer in the military based solely on their HIV status.

73.     Defendants routinely permit similarly situated individuals who are not HIV positive, including but not limited to people with comparable chronic, manageable conditions, to enlist in the military and to commission as officers, including for positions such as attorney in the Judge Advocate General Corps for the D.C. National Guard.

74.     Defendants have refused to grant Plaintiff Nick Harrison a commission as an officer serving as an attorney in the Judge Advocate General Corps for the D.C. National Guard based solely on his HIV status.

75.     Although some individuals living with HIV may qualify under certain statutory schemes as having a disability or as being disabled, discrimination targeting people based on their HIV-positive status warrants a more rigorous degree of scrutiny than was described in *City of Cleburne, Texas v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985).

76.     Government discrimination against individuals living with HIV bears all the indicia of a suspect classification requiring heightened scrutiny by the courts.

a.  People living with HIV have suffered through a unique history of misinformation, stigma and discrimination for decades, and continue to suffer such discrimination to this day.

b.  People living with HIV are a discrete and insular group and lack the political power to protect their rights through the legislative process.  A small minority of the overall population is currently living with HIV.  People living with HIV fear to disclose their status, rarely choose to live openly with HIV, and continue to lack representation at any level of the federal government.  For the first decade of the HIV epidemic, the needs of people living with and at higher risk for HIV were ignored and/or not adequately resourced by federal, state, and local governments.  Even today, many

18

people living with HIV do not have access to care, and there are aspects of the

criminal law that unfairly single out and discriminate against people living with HIV.

c.  Particularly in light of dramatic medical advances—the benefits of which have only

recently been fully understood and documented—a person's HIV status bears no

relation to that person's ability to contribute to society.

d.  Even with medical treatment rendering their viral load undetectable, a person cannot

change their HIV status. While HIV is treatable and manageable, it is not curable.

There is no available course of treatment that a person could undergo to change their

status as a condition of equal treatment.

77.     Defendants' disparate treatment of Plaintiff Nick Harrison and other individuals

living with HIV deprives them of their right to equal dignity and stigmatizes them as second-

class citizens in violation of equal protection guarantees.

78.     There is no longer a valid purpose for this disparate treatment, and neither is the

classification at issue—HIV status—adequately tailored in service of any governmental interest.

This disparate treatment is not even rationally related to a legitimate governmental interest, let

alone is there an important or compelling governmental interest to justify it.  Thus, the enlistment

ban and service restrictions cannot withstand any form of scrutiny and are invalid.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Issue a judgment, pursuant to 28 U.S.C. §§ 2201-02, declaring the service restrictions and accessions bar unconstitutional on their face and as applied to Plaintiff;

2. Enjoin Defendants, their agents, employees, representatives, successors, and any other person or entity subject to their control or acting directly or indirectly in concert with them from enforcing the accessions bar or service restrictions, including by enjoining any separation, discharge, adverse action, or denial of promotion, reenlistment, continuation of service, accession, or appointment because an individual is living with HIV.

3. Require the Army to retroactively commission Plaintiff Nick Harrison as an officer with the rank of captain in the Judge Advocate General Corps for the District of Columbia National Guard as of September 2014, or require the Army to waive any age restrictions and to commission Plaintiff now as an officer in the Judge Advocate General Corps for the District of Columbia National Guard at the rank to which he would have advanced as of the conclusion of this litigation had he commissioned as a captain in September 2014.

4. Award Plaintiffs costs, expenses, and reasonable attorneys' fees pursuant to 28 U.S.C. § 2412 and any other applicable laws; and

5. Grant any injunctive or other relief that this Court deems just, equitable, and proper.

Dated:  May 30, 2018


_/s/  Scott A. Schoettes_

Scott A. Schoettes*
SSchoettes@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
105 W. Adams, Suite 2600
Chicago, IL 60603
T: (312) 663-4413


Anthony Pinggera*
APinggera@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
4221 Wilshire Blvd, Suite 280
Los Angeles, CA 90010
T: (213) 382-7600


Peter E. Perkowski*
PeterP@outserve.org
OUTSERVE-SLDN, INC.
P.O. Box 65301
Washington, DC 20035-5301
T: (800) 538-7418


* motion for _pro hac vice_ admission pending

_/s/  Andrew R. Sommer_

Andrew R. Sommer
Virginia State Bar No. 70304
ASommer@winston.com
Cyrus T. Frelinghuysen*
CFrelinghuysen@winston.com
John W.H. Harding
Virginia State Bar No. 87602
JWHarding@winston.com
WINSTON & STRAWN LLP
1700 K St., NW
Washington, DC 20006
T: (202) 282-5000