**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

NICHOLAS HARRISON, ET AL.,

               Plaintiffs,

   v.

JAMES N. MATTIS, ET AL.,

            Defendants.

CIVIL ACTION NO. 1:18-CV-00641

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

# **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................... 1

II.     STATEMENT OF FACTS ...................................................................................... 2

    A.   Overview Regarding the Human Immunodeficiency Virus (HIV) ................................. 2

    B.   The Military's Policies and Regulations Regarding HIV ................................................ 4

    C.   Sergeant Harrison's Military Service ............................................................................. 6

III.    LEGAL STANDARD ............................................................................................. 8

IV.     ARGUMENT ........................................................................................................... 9

    A.   Plaintiffs Are Likely to Succeed on the Merits Because the Military's Policies Regarding HIV-Positive Individuals Violate Equal Protection. ..................................... 9

      1.   Heightened Scrutiny Applies to the Military's Policies Singling Out People with HIV. 9

        a.   The history of stigma and discrimination against people living with HIV is extensive and substantial. ............................................................................................. 9

        b.   People living with HIV lack relative political power. ................................................ 15

        c.   HIV is an immutable characteristic. ........................................................................... 17

        d.   People living with HIV contribute to society at the same level as others. ................ 18

        e.   Applying Heightened Scrutiny To Policies Targeting People Living With HIV Is Consistent with *City of Cleburne v. Cleburne Living Center*. ................................. 20

      2.   The Military's Restrictions on Military Service for People Living with HIV Are Not Even Rationally Related to Military Effectiveness. ................................................................ 22

        a.   A Soldier's HIV Diagnosis Bears No Relationship to His or Her Fitness, Military Readiness, Effectiveness, or Lethality. .................................................................... 23

        b.   Soldiers Living with HIV Who Are Deployed Can Easily Be Provided with Necessary Medical Care. ............................................................................................ 24

        c.   Other Purported Justifications for Restrictions on Military Service for HIV-Positive Individuals Do Not Pass Muster. ............................................................................. 25

    B.   Plaintiff and Other HIV-Positive Service Members Will Be Irreparably Harmed Absent a Preliminary Injunction. ............................................................................................. 27

    C.   The Balance of Equities Weigh in Favor of Plaintiffs .................................................. 29

    D.   The Public Interest Favors an Injunction ..................................................................... 30

V.      CONCLUSION ....................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona Dream Act Coalition v. Brewer*,
    855 F.3d 957 (9th Cir. 2017) ................................................28

*Aziz v. Trump*,
    234 F.Supp.3d 724 (E.D. Va. 2017) ................................................29, 30

*Bowers v. Hardwick*,
    478 U.S. 186 (1986)................................................10

*Centro Tepeyac v. Montgomery Cty.*,
    722 F.3d 184 (4th Cir. 2013) ................................................29

*City of Cleburne v. Cleburne Living Center*,
    473 U.S. 432 (1985)................................................20, 21, 22

*Contractors Association of Eastern Pennsylvania, Inc. v. City of Philadelphia*,
    6 F.3d 990 (3d Cir. 1993)................................................22

*Crawford v. Cushman*,
    531 F.2d 1114 (2d Cir. 1976)................................................8

*Dahl v. Secretary of U.S. Navy*,
    830 F. Supp. 1319 (E.D. Cal. 1993)................................................8

*Doe v. City of Chicago*,
    883 F.Supp. 1126 (7th Cir. 1994) ................................................22

*Doe v. University of Maryland Medical Systems Corp.*,
    50 F.3d 1261 (4th Cir. 1995) ................................................20

*EEOC v. Granite Mesa Health Ctr. Ltd.*,
    No. 1:16-cv-01113-LY (W.D. Tex. Feb. 18, 2017)................................................18

*Elrod v. Burns*,
    427 U.S. 347 (1976)................................................29

*Elzie v. Aspin*,
    841 F.Supp. 439 (D.D.C. 1993)................................................28

*Emory v. Secretary of Navy*,
    819 F.2d 291 (D.C. Cir. 1987)................................................8

*Evancho v. Pine-Richland School District,*
   237 F.Supp.3d 267 (W.D. Pa. 2017) ......................................................................29

*Fishman v. Paolucci,*
   628 F. App'x. 797 (2d Cir. 2015) .........................................................................28

*Frontiero v. Richardson,*
   411 U.S. 677 (1973) .............................................................................................21

*Giovani Carandola, Ltd. v. Bason,*
   303 F.3d 507 (4th Cir. 2002) ...............................................................................30

*Goldman v. Weinberger,*
   475 U.S. 503 (1986) ...............................................................................................8

*Larsen v. U.S. Navy,*
   486 F. Supp. 2d 11 (D.D.C. 2007) .........................................................................8

*League of Women Voters of N.C. v. North Carolina,*
   769 F.3d 224 (4th Cir. 2014) .................................................................................8

*Leckelt v. Board of Commissioners of Hospital District No. 1,*
   714 F. Supp. 1377 (E.D. La. 1989) .....................................................................22

*Log Cabin Republicans v. United States,*
   2012 WL 12952732 (C.D. Cal. Mar. 15, 2012), *vac'd on other grounds* ............28

*Mathews v. Lucas,*
   427 U.S. 495 (1976) .............................................................................................22

*Memorial Hospital v. Maricopa County,*
   415 U.S. 250 (1974) .............................................................................................25

*United States v. Carolene Products Co.,*
   304 U.S. 144 (1938) .............................................................................................17

*United States v. South Carolina,*
   720 F.3d 518 (4th Cir. 2013) .................................................................................8

*Windsor v. United States,*
   699 F. 3d 169 (2d Cir. 2012), *aff'd,* 133 S. Ct. 2675 (2013) .................................9

*Worster v. Carlson Wagon Lit Travel, Inc.,*
   353 F.Supp.2d 257 (D. Conn. 2005) ....................................................................21

## Statutes

42 U.S.C. §1382c(a)(3)(A) ...........................................................................................21

42 U.S.C. §12102(1)(A)...........................................................................................................21

Ohio Rev. Code Ann. §2903.11 (2016) ...................................................................................17

**Regulations**

Army Regulation ("AR") 600-110, "Identification, Surveillance, and
    Administration of Personnel Infected with Human Immunodeficiency Virus" ........5, 6, 23, 25

Air Force Instruction ("AFI") AFI44-178 (Jun. 28, 2016), *Human
    Immunodeficiency Virus Program* ............................................................................................5

*Department of Defense Retention Policy for Non-Deployable Service Members*
    (Feb. 14, 2018), *at* https://www.defense.gov/Portals/1/Documents/pubs/ ..................... *passim*

Department of Defense Instruction ("DoDI") 6130.03, *Medical Standards for
    Appointment, Enlistment, or Induction in the Military Services*..............................................24

Department of Defense Instruction ("DoDI") 6485.01 (1991), *Human
    Immunodeficiency Virus (HIV) in Military Service Members* ...................................................4

Department of Defense Instruction ("DoDI") 6485.01 (2013), *Human
    Immunodeficiency Virus (HIV) in Military Service Members* ..........................................4, 5, 6

Department of Defense Instruction ("DoDI") 6490.07 (Feb. 5, 2010),
    *Deployment-Limiting Medical Conditions for Service Members and DoD
    Civilian Employees* .........................................................................................................1, 5, 6

SECNAV Instruction ("SECNAVINST") 5300.30E (Aug. 13, 2012),
    *Management of Human Immunodeficiency Virus, Hepatitis B Virus and
    Hepatitis C Virus Infection in the Navy and Marine Corps*................................................5, 27

**LISTING OF EXHIBITS**

| Exhibit | Description |
| --- | --- |
| Exhibit A | *Department of Defense Retention Policy for Non-Deployable Service Members* (Feb. 14, 2018) (hereinafter, "DOGO Policy"), *available at* https://www.defense.gov/Portals/1/Documents/pubs/DoD-Universal-Retention-Policy.PDF |
| Exhibit B | Expert Declaration of Carlos Del Rio, M.D. |
| Exhibit C | Declaration of Sergeant Nicholas Harrison |
| Exhibit D | Expert Declaration of Trevor Hoppe, MPH, PhD |
| Exhibit E | Expert Declaration of Craig W. Hendrix, M.D. |
| Exhibit F | Declarant 1 Declaration |
| Exhibit G | Declarant 2 Declaration |

## I.    INTRODUCTION

People living with HIV have served in this nation's armed services with distinction for decades. For much of that time, their service has been unjustifiably restricted based on misconceptions regarding the consequences of an HIV diagnosis. In this action, Plaintiffs Sergeant Nicholas Harrison and OutServe-SLDN are challenging long-standing Department of Defense (DoD) policies that prevent the enlistment, deployment, and commissioning of people living with HIV.

In February 2018, the DoD issued a new policy that will result in the discharge of all service members who are non-deployable for 12-consecutive months (hereinafter the "Deploy or Get Out" or "DOGO Policy").[1] Service members with HIV are, by default, considered non-deployable.[2] The "Deploy or Get Out" Policy became effective upon issuance[3] and provides that "[t]he Military Services have until October 1, 2018, to begin ***mandatory processing*** of non-deployable Service members . . . [although] they may begin such processing immediately."[4]

Not only is the October 1, 2018 implementation deadline imminent, but Plaintiffs have become aware that several service members living with HIV are being discharged or are having their service restricted as a result of the new DOGO Policy. Because irreparable harm to Sgt. Harrison and to the service members whose interests are represented in this lawsuit by OutServe-SLDN is now imminent, Plaintiffs seek a preliminary injunction to preserve the status quo by

---

[1] *Department of Defense Retention Policy for Non-Deployable Service Members* (Feb. 14, 2018) (hereinafter, "DOGO Policy"), *at* https://www.defense.gov/Portals/1/Documents/pubs/ DoD-Universal-Retention-Policy.PDF. (Ex. A).

[2] *See* DoDI 6490.07, Encl. 3, ¶e(2).

[3] *See* L. Ferdinando, *Pentagon Releases New Policy on Nondeployable Members*, U.S. Dep't of Defense (Feb. 16, 2018), *at* https://www.defense.gov/News/Article/Article/1443092/pentagon-releases-new-policy-on-nondeployable-members/.

[4] Wilkie, DOGO Policy, *supra*, at n.1 (emphasis added).

suspending implementation of the new DOGO Policy as applied to any service member

classified as non-deployable based solely on their HIV status.

## II.    STATEMENT OF FACTS

### A.    Overview regarding the Human Immunodeficiency Virus (HIV)

Until the mid-1990s, HIV was a universally terminal condition. Del Rio Decl. ¶21 (Ex.

B). The virus operates by gaining a foothold in the blood, hijacking the cells of the body's

immune system and using them to create copies of itself. *Id.* ¶12. These copies then target for

destruction CD4 T-cells, which are critical to the human body's ability to fight infections. *Id.*

¶14. If left untreated, the virus multiplies to levels that allow it to reduce the overall quantity of

CD4 cells and the body becomes progressively more prone to "opportunistic infections." *Id*. A

person with fewer than 200 CD4 T-cells per milliliter of blood simultaneously with an

opportunistic infection has progressed to the third stage of the disease and is diagnosed with

Acquired Immune Deficiency Syndrome (AIDS).[5]

In 1996, however, everything changed. New antiretroviral medications that attack the

virus and prevent it from replicating transformed the landscape of HIV treatment and radically

shifted health outcomes for people living with HIV. Del Rio Decl. ¶16. Antiretrovirals reduce the

number of copies of the virus present in a person's blood. *Id.* ¶17. Successful treatment reduces a

person's "viral load"—which can measure as high as one million copies per milliliter of blood—

to less than fifty copies per milliliter. *Id*. This is referred to as having a suppressed or

"undetectable" viral load. *Id*. Today, any person who consistently takes their antiretroviral

medications will reach an undetectable viral load. *Id*. ¶18.

---

[5] *See* U.S. Centers for Disease Control and Prevention (CDC), *About HIV/AIDS*, *at*
https://www.cdc.gov/hiv/basics/whatishiv.html.

With the reduction in viral load, CD4 T-cells rebound and the immune system recovers, thereby restoring even those with advanced HIV to good health.[6] Patients with an AIDS diagnosis—sometimes with a CD4 count as low as one—literally have been brought back from the brink of death with antiretroviral combination therapy.[7] For anyone with access to care, HIV is no longer a terminal condition.[8] Indeed, someone "who is diagnosed with HIV in a timely manner and adheres to their prescribed antiretroviral therapy has very nearly the same life expectancy as a person who is not living with HIV."[9] Del Rio Decl. ¶21.

Over the last twenty-two years, researchers and clinicians have refined the antiretroviral pharmaceuticals to make adherence easier and health outcomes even better. *Id.* ¶20. Three antiretroviral medications were combined into a single pill a person can take once a day, known as a single tablet regimen or "STR," with no reduction in effectiveness. *Id*. Side effects have been reduced to the point where most people in treatment experience few or no side effects.[10] While still not curable, HIV is now a chronic, manageable condition rather than a terminal diagnosis.[11]

At the same time, science has made great strides in understanding the transmission of

---

[6] Selina Corkery, *Factsheet: Diagnosed with HIV at a low CD4 count*, NAM AIDSMap (March 2016), *at* http://www.aidsmap.com/Diagnosed-with-HIV-at-a-low-CD4-count/page/2182215/.
[7] *Id.*
[8] HIV.gov, *What Are HIV and AIDS?* (May 15, 2017), *at* https://www.hiv.gov/hiv-basics/overview/about-hiv-and-aids/what-are-hiv-and-aids.
[9] Samji et al., *Closing the Gap: Increases in Life Expectancy among Treated HIV-Positive Individuals in the United States and Canada*, 8(12) PLoS ONE (2013), *at* http://journals.plos.org/plosone/article?id=10.1371/journal.pone.0081355.
[10] U.S. DHHS, *Fact Sheets: Side Effects of HIV Medicines* (Oct. 9, 2017), *at* https://aidsinfo.nih.gov/understanding-hiv-aids/fact-sheets/22/63/hiv-medicines-and-side-effects.
[11] HIV.gov, *What Are HIV and AIDS?* (May 15, 2017).

HIV.[12] Contrary to popular belief, HIV is not easily transmitted. The riskiest sexual activity has

only a 1.38% per-act chance of transmitting HIV.[13] More important, if a person is in consistent

treatment and achieves viral suppression, the risk of transmission is essentially zero for any

sexual activity. Del Rio Decl. ¶25.

Outside of sexual activity, the only activities that present a measurable risk of HIV

transmission are the sharing of injection drug equipment, blood transfusion, needle sticks, and

perinatal exposure. For all other activities—including biting, spitting, throwing of body fluids, or

blood spatter—the CDC characterizes the risk as negligible, which it defines as "technically

possible but unlikely and not well documented."[14] Access to treatment and the resultant viral

suppression eliminates even the theoretical possibility of transmission in these latter contexts.

Del Rio Decl. ¶27.

## B.      The Military's Policies and Regulations Regarding HIV

The military has had regulations restricting the service of people living with HIV since

well before the advent of effective antiretroviral therapy. In 1991, the DoD issued its first version

of Instruction 6485.01, which officially made people living with HIV ineligible for appointment,

enlistment, pre-appointment, or initial entry training for military service.[15] While this Instruction

has been adjusted in minor ways over the years, the underlying bar on enlistment and

appointment has remained the same since 1991.[16]

---

[12] *See* CDC, *Effectiveness of Prevention Strategies to Reduce the Risk of Acquiring or Transmitting HIV, at* https://www.cdc.gov/hiv/risk/estimates/preventionstrategies.html (updated Mar. 7, 2017).
[13] *See* CDC, *HIV Risk Behaviors: Estimated Per-Act Probability of Acquiring HIV from an Infected Source, by Exposure Act, at* www.cdc.gov/hiv/risk/estimates/riskbehaviors.html (updated Dec. 4, 2015). Per-act risk for other sexual activities is between zero and .08%.
[14] *See* CDC, *HIV Risk Behaviors*, supra.
[15] DoDI 6485.01 (1991), ¶ 4.1-4.
[16] DoDI 6485.01 (2013), ¶ 3.a.

Under this Instruction, service members who first test positive for HIV while on active duty are allowed to continue serving "in a manner that ensures access to appropriate medical care."[17] With the exception of the Navy—which has recently allowed service members to deploy on certain overseas vessels—the various service branches have interpreted this policy to require that people living with HIV be stationed within the continental United States.[18]

Further, DoD Instruction 6490.07 specifically identifies HIV as a medical condition that limits a service member's deployability.[19] Under DoDI 6490.07, a service member living with HIV should not to be deployed outside the continental United States unless a medical waiver is granted after consultation with the Combatant Command surgeon.[20]

The Army has implemented the policy requirements of DoDI 6485.01 and 6490.07 as AR 600-110, "Identification, Surveillance, and Administration of Personnel Infected with Human Immunodeficiency Virus" ("AR 600-110"). AR 600-110 implements a blanket prohibition on the accession of individuals living with HIV. "Accession" is defined in the regulation as enlistment in either the Army or Reserves, appointment as a West Point cadet, or an initial appointment as a commissioned officer. Under these rules, an enlisted active duty service member who wishes to become a commissioned officer will not be able to receive a commission if they are living with HIV even if they seroconverted (*i.e.*, became HIV-positive) while on active duty.[21] AR 600-110 also requires that service members living with HIV be stationed only in the continental United States, Alaska, Hawaii, Guam, Puerto Rico, or the U.S. Virgin Islands,

---

[17] *Id.*, Encl. 3, ¶ 2.c.
[18] SECNAVINST 5300.30E, ¶ 9.b; AFI 44-178, ch. 2.4.2; AR 600-110, ch. 1-16.f.
[19] Dep't of Def., Instruction No. 6490.07, (Feb. 5, 2010), *at* https://www.dcms.uscg.mil/Portals/10/CG-1/cg112/cg1121/docs/pdf/MedicalConditionsDeployments.pdf ("DoDI 6490.07")
[20] *See* DoDI 6490.07, Encl. 3, ¶ e(2).
[21] *See* AR 600-110, ch. 5.2.a.

unless they are granted a medical waiver.[22] Such waivers, however, are rarely (if ever) granted.

Service members living with HIV are also required to receive and adhere to treatment for their condition.[23] Each member's condition is monitored regularly, and their vital statistics, such as viral load and CD4 count, are tracked.[24] A service member living with HIV can be medically separated if they "demonstrate progressive clinical illness or immunological deficiency as determined by medical authorities."[25] Until very recently, they could not be discharged solely because of their HIV status.[26]

The DoD recently issued a policy of general applicability that makes it effectively impossible for people living with HIV to serve as members of the military. On February 14, 2018, the DoD issued a new policy stating that "[s]ervice members who have been non-deployable for more than 12 consecutive months, for any reason, will be processed for administrative separation."[27] As discussed above, all service members living with HIV and currently serving in the military are, by default, considered non-deployable.[28] Therefore, the new DOGO Policy, acting in tandem with existing DoD Instructions and Army Regulations, creates a *de facto* prohibition against individuals with HIV serving in the Army.

### C.     Sergeant Harrison's Military Service

Plaintiff Nicholas Harrison has been serving his country with distinction since 2000. He first joined the U.S. Army eighteen years ago, at the age of 23, and spent three years stationed in Alaska after basic training. Harrison Decl. ¶2 (Ex. C). In 2003, when Sgt. Harrison was

---

[22] *See* AR 600-110, ch. 1-16.f.
[23] DoDI 6485.01 (2013), Encl. 3, ¶ 2.c.
[24] AR 600-110, ch. 1-16.d.
[25] AR 600-110, ch. 6-15.
[26] AR 600-110, ch. 1-16.e.
[27] *See* Wilkie, DOGO Policy, *supra*, n.1.
[28] *See* DoDI 6485.01; DoDI 6490.07*; see also* AR 600-110.

discharged from active duty, he joined the Army Reserves, returning to his home state of Oklahoma to continue his education while serving in the Oklahoma National Guard. *Id.* ¶3. After receiving a bachelor's degree, he enrolled in law school at Oklahoma City University and was the top student in his class after the first semester. *Id.* ¶4.

Sgt. Harrison's legal education was interrupted, however, by the call of duty. His National Guard deployed to Afghanistan for sixteen months beginning in March 2006 in support of Operation Enduring Freedom. *Id.* ¶5. While deployed, Sgt. Harrison was recognized for his meritorious service with the Army Commendation Medal. *Id.* ¶6. Upon returning to Oklahoma, Sgt. Harrison completed his education, receiving both his J.D. and his M.B.A. from the University of Oklahoma in 2011. *Id.* ¶10. Before sitting for the bar exam, he was called to active duty once more. *Id.* ¶11. Sgt. Harrison deployed for a second tour of duty in 2011, this time to Kuwait, where his unit engaged in security for convoys withdrawing from Iraq. *Id.*

Shortly after returning from his second tour of duty in 2012, Sgt. Harrison was diagnosed with HIV. *Id* ¶12. In keeping with Army regulations, he was immediately placed on antiretroviral combination therapy. *Id.* Soon thereafter, he had an undetectable viral load. *Id.* His viral load has remained suppressed or undetectable ever since. *Id.* ¶13.

After passing the Oklahoma bar, Sgt. Harrison moved to Washington, DC, to become a Presidential Management Fellow. *Id.* ¶¶14-15. He subsequently was offered a position in the Judge Advocate General (JAG) Corps in the DC National Guard, which required his elevation to officer. *Id.* at 16. Unfortunately, Sgt. Harrison soon discovered that Army policy denied officer status to people living with HIV. Sgt. Harrison requested a medical waiver, but his request was denied. *Id.* ¶¶19-20. Sgt. Harrison then sought an exception to policy (ETP), and many months later, that request also was denied. *Id.* ¶¶24-27. In this lawsuit, Sgt. Harrison seeks relief under

the equal protection guarantees of the U.S. Constitution.

## III.   LEGAL STANDARD

To obtain a preliminary injunction, a moving party must show: (1) a clear likelihood of success on the merits; (2) a clear likelihood that he or she will suffer irreparable harm in the absence of such relief; (3) that the balance of equities tips in plaintiff's favor; and (4) that an injunction is in the public interest. *United States v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013) (citations omitted). "While plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits, they 'need not show a certainty of success.'" *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (citation omitted).

Although "constitutional review" of military regulations is often "more deferential than [such] review of similar … regulations designed for civilian society," *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986), military personnel decisions are subject to equal protection constraints. *See, e.g., Emory v. Sec'y of Navy*, 819 F.2d 291, 294, 260 (D.C. Cir. 1987) ("The military has not been exempted from constitutional provisions that protect the rights of individuals. It is precisely the role of the courts to determine whether those rights have been violated.") (citations omitted); *Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir. 1976) ("[T]he military is subject to the Bill of Rights and its constitutional implications."); *Larsen v. U.S. Navy*, 486 F. Supp. 2d 11, 18-19 (D.D.C. 2007) (rejecting Navy's contention "its personnel decisions are immune from judicial scrutiny where constitutional wrongs are alleged"); *Dahl v. Sec'y of U.S. Navy*, 830 F. Supp. 1319, 1328 (E.D. Cal. 1993) ("the essence of individual constitutional rights … remain[s] intact" in military).

## IV.   ARGUMENT

### A.   Plaintiffs Are Likely to Succeed on the Merits Because the Military's Policies Regarding HIV-Positive Individuals Violate Equal Protection.

The military's accessions and deployment policies with respect to people living with HIV violate the equal protection guarantees of the Constitution. As a group, people living with HIV meet all of the criteria defining a suspect or quasi-suspect class. Therefore, regulations and policies that single them out for disparate treatment should be subjected to heightened scrutiny. *Windsor v. United States*, 699 F. 3d 169, 181 (2d Cir. 2012) (holding that heightened scrutiny is warranted where government targets a class that: (1) has been "historically subject to discrimination," (2) has a defining characteristic bearing no "relation to ability to perform or contribute to society," (3) has "obvious, immutable, or distinguishing characteristics," and (4) is "a minority or politically powerless." (internal quotation marks omitted)), *aff'd*, 133 S. Ct. 2675 (2013). Regardless of the level of scrutiny applied, however, the government's policies do not pass constitutional muster, because the accessions and deployment policies with respect to people living with HIV lack a rational relationship to a legitimate government interest.

### 1.   Heightened Scrutiny Applies to the Military's Policies Singling Out People with HIV.

#### a.   The history of stigma and discrimination against people living with HIV is extensive and substantial.

The scope and intensity of stigma and discrimination against people living with HIV is unprecedented for any medical condition in the history of the United States. Hoppe Decl. ¶12 (Ex. D). From the very beginning of the HIV/AIDS epidemic, discrimination was rampant, based largely on the perceived infectiousness of people with this condition and pre-existing stigma against the groups most affected at that time. *Id.* ¶8. Despite all that has been learned about HIV since that time, persistent misconceptions regarding the actual routes and risks of transmission

continue to fuel stigma and discrimination against people living with HIV.[29]

From the outset, a great number of people feared interacting with people with HIV despite clear evidence that the condition was not communicated through casual contact.[30] The demographics of the groups disproportionately reinforced the stigma and discrimination experienced by people living with HIV. As soon as the condition that would later be called "AIDS" appeared on the scene, it was met with a combination of apathy and disapprobation based on the sexual identity of the individuals in whom the condition was first recognized. Hoppe Decl. ¶7. In fact, before it was known that AIDS was caused by a virus, many hypothesized that it was caused by the "deviant lifestyle" of gay men in New York and other major cities in the U.S.[31] Notably, laws criminalizing intimacy between members of the same sex still existed in many states. *Bowers v. Hardwick*, 478 U.S. 186, 193-94 (1986) ("24 States and the District of Columbia continue to provide criminal penalties for sodomy performed in private and between consenting adults"), *rev'd, Lawrence v. Texas*, 539 U.S. 558 (2003).

Religious leaders and others described AIDS as a biblical punishment.[32] For example, in 1987, Reverend Jerry Falwell—leader of the Moral Majority—famously said, "God destroyed Sodom and Gomorrah primarily because of the sin of homosexuality. Today He is again bringing

---

[29] *Wash. Post/Kaiser Family Foundation 2012 Survey of Americans on HIV/AIDS* 13 (2012).

[30] Diana, Princess of Wales, famously stunned the world in 1987 when she shook the hand of a person living with HIV without wearing gloves. *See How Princess Diana Changed Attitudes to AIDS*, BBC, (Apr. 5, 2017), *at* https://www.bbc.com/news/av/magazine-39490507/how-princess-diana-changed-attitudes-to-aids.

[31] *See, e.g.,* Lawrence K. Altman, *New Homosexual Disorder Worries Health Officials*, N.Y. Times, May 11, 1982, *at* https://www.nytimes.com/1982/05/11/science/new-homosexual-disorder-worries-health-officials.html (theorizing that AIDS, then referred to as "gay-related immunodeficiency" or GRID, may be caused by a combination of sexual promiscuity, nitrite drugs, and introduction of sperm into the blood through sexual contact).

[32] *The Social Impact of AIDS in the United States* 131 (Jonson and Stryker eds., 1993) (quoting evangelical pastors condemning AIDS as the wages of sin).

judgment against this wicked practice through AIDS."[33] To this day, public figures echo such sentiments and continue to foster perceptions that HIV is a result of immorality.[34] As of 2014, approximately one quarter of white evangelical protestants, and 14% percent of Americans overall, continue to believe that HIV is divine punishment for "immoral sexual behavior."[35]

Those who publicly condemned people living with HIV often had authority over public policy. In 1988, Jesse Helms, the long-time Senator from North Carolina, opposed funding research and treatment for AIDS because he believed that AIDS was God's punishment for homosexuals and that "not one single case of AIDS in this country . . . cannot be traced in origin to sodomy."[36] A year before, Helms had successfully included an amendment to an appropriations bill adding HIV to the list of diseases that prevent people from traveling or immigrating to the United States.[37] That policy remained in place until 2010.[38] In 1995, Helms opposed funding the Ryan White Care Act, saying that people had contracted AIDS due to their "deliberate, disgusting, revolting conduct" and that AIDS was "a disease transmitted by people

---

[33] Peter L. Allen, *The Wages of Sin: Sex and Disease, Past and Present* 123 (2002).

[34] *E.g.,* Michael W. Chapman, CNSNews Blog, Pastor Rick Scarborough: 'I Believe' AIDS 'Was God's Judgement on a Sinful Generation' (Jan. 28, 2016), *at* https://www.cnsnews.com/blog/michael-w-chapman/pastor-rick-scarborough-i-believe-aids-was-gods-judgment-sinful-generation.

[35] Robert P. Jones, Daniel Cox, and Juhem Navarro-Rivera, *A Shifting Landscape: A Decade of Change in American Attitudes about Same-sex Marriage and LGBT Issues* 44 (2014), *at* https://www.prri.org/wp-content/uploads/2014/02/2014.LGBT_REPORT-1.pdf.

[36] *Former Sen. Jesse Helms dies at 86*, Los Angeles Times, July 5, 2008, *at* http://www.latimes.com/news/la-me-helms5-2008jul05-story.html.

[37] David Lauter and Marlene Cimons, *Clinton to Drop Travel Ban on HIV Patients*, L.A. Times, Feb. 5, 1993, *at* http://articles.latimes.com/1993-02-05/news/mn-1021_1_white-house.

[38] Devin Dwyer, *U.S. Ban on HIV-Positive Visitors, Immigrants Expires*, ABC News (Jan. 5, 2010), https://abcnews.go.com/Politics/united-states-ends-22-year-hiv-travel-ban/story?id=9482817.

deliberately engaging in unnatural acts." [39]

The stigma against people living with HIV was widespread. In 1983, Pat Buchanan—an advisor to President Nixon and a candidate for the Republican presidential nomination in 1992 and 2000—declared that "the poor homosexuals . . . have declared war upon nature, and now nature is exacting an awful retribution."[40] Buchanan alleged that there was a liberal conspiracy of silence among doctors regarding the level of threat posed to the American public through "AIDS-carrying homosexuals." Conservative commentator William F. Buckley famously called for all newly-diagnosed patients to be tattooed as HIV-positive, and countless other leaders called for public health departments to institute quarantine procedures and to criminalize people living with HIV who they viewed as a threat to the health of others. Hoppe Decl. ¶10.

In 1986, political conspiracy theorist Lyndon LaRouche succeeded in adding Proposition 64 to the November ballot in California.[41] The Proposition would have required anyone living with HIV to be reported to state authorities, barred from schools, and, if state officials deemed it appropriate, quarantined.[42] As recently as 2017, Georgia state representative Betty Price, the wife of former Secretary of Health and Human Services Tom Price, sought to quarantine people living with HIV, arguing that doing so now is necessary because, "in the past, [people living with HIV] died more readily, and then at that point, they are not posing a risk."[43]

In 1985, a controversy erupted over Ryan White, who at age 13 was diagnosed with an

---

[39] Katharine Q. Seelye, *Helms Puts the Brakes to a Bill Financing AIDS Treatment*, N.Y. Times (Jul. 5, 1995), *at* https://www.nytimes.com/1995/07/05/us/helms-puts-the-brakes-to-a-bill-financing-aids-treatment.html.
[40] Patrick Buchanan, *Homosexuals and Retribution*, N.Y. POST, May 24, 1983.
[41] Acquired Immune Deficiency Syndromes (AIDS), California Proposition 64 (1986).
[42] *Id.*
[43] Ben Tinker, *Georgia lawmaker: Can people with HIV be 'legally' quarantined?*, CNN (Oct. 22, 2017), *at* https://www.cnn.com/2017/10/20/health/betty-price-hiv-aids-quarantine/index.html.

advanced case of AIDS, the result of a tainted blood product used to treat his hemophilia.[44]

When Ryan attempted to return to his middle school in Kokomo, Indiana, teachers, parents and

administrators resisted.[45] When courts and administrative bodies established that Ryan did not

present any type of risk to the health or safety of other students and he was finally allowed to

return to school in February 1986,[46] 151 of 360 students stayed home and seven transferred

schools.[47] Shortly after that, a home school opened in a neighboring town for the express

purpose of educating students whose parents did not want them to attend school with Ryan.[48]

　　　　Misconceptions about the ways in which HIV is *and is not* transmitted persist and

continue to fuel the discrimination experienced by people living with HIV.[49] Indeed,

discrimination against people living with HIV not only continues but has remained stable and

---

[44] Dirk Johnson, *Ryan White Dies of AIDS at 18; His Struggle Helped Pierce Myths*, N.Y. TIMES (Apr. 9, 1990) *at* https://www.nytimes.com/1990/04/09/obituaries/ryan-white-dies-of-aids-at-18-his-struggle-helped-pierce-myths.html.

[45] Christopher M. MacNeil, *School bars door to youth with AIDS*, KOKOMO TRIBUNE, (Aug. 31, 1985, *at* http://www.hemophiliafed.org/news-stories/2014/03/1985-ryan-white-banned-from-school-because-of-aids/.

[46] *Indiana Judge Allows AIDS Victim Back in School*, N.Y. TIMES (Apr. 11, 1986), *at* https://www.nytimes.com/1986/04/11/us/indiana-judge-allows-aids-victim-back-in-school.html.

[47] Ryanwhite.com, *A Timeline of Key Events in Ryan's Life*, *at* http://web.archive.org/web/20071012032359/www.ryanwhite.com/pages/timeline.html (archived, last visited Jul. 16, 2018).

[48] *Id.*

[49] In 2012, the Kaiser Family Foundation and *The Washington Post* conducted a national survey establishing that approximately one-third (34%) of the pubic held one or more of the following misconceptions: (1) that HIV can be transmitted by sharing a drinking glass (27%); (2) that HIV can be transmitted by touching a toilet seat (17%); or (3) that HIV can be transmitted by swimming in a pool with someone who is HIV positive (11%). *Washington Post/Kaiser Family Foundation 2012 Survey of Americans on HIV/AIDS* 13 (2012). In the same survey, 20% of respondents said they would be somewhat or very uncomfortable working with someone who has HIV or AIDS; 26% said they would be somewhat or very uncomfortable if their child had an HIV-positive teacher; 33% said they would be somewhat or very uncomfortable having a roommate who was HIV positive; and 44% said they would be somewhat or very uncomfortable if their food was prepared by someone who is HIV positive. *Id.* at 16.

may be on the rise.[50] From FY 2010 - FY 2017, the U.S. Equal Employment Opportunity

Commission (EEOC) reported receiving 1,693 complaints of employment discrimination based

on HIV status.[51] This is slightly more than the number of such complaints received in the prior

eight-year period.[52] In 2006, a Williams Institute study of healthcare providers in Los Angeles

County revealed that "46% of skilled nursing facilities, 26% of plastic and cosmetic surgeons,

and 55% of obstetricians in Los Angeles County would not take any patient who was HIV-

positive for any type of service, even when patients were asymptomatic."[53] And in one

particularly disturbing throwback to the discrimination experienced by Ryan White, the Milton

Hershey School, a private boarding school in Pennsylvania, denied admission in 2011 to a 14-

year-old boy after learning that he was living with HIV.[54]

    Additionally, after HIV was identified as the cause of AIDS in 1984, state lawmakers

around the country began to consider bills to institute disease control programs targeting this new

epidemic. Hoppe Decl. ¶11. Along with other more conventional measures, lawmakers in 45

---

[50] "Individuals living with HIV have been detrimentally affected in every aspect of life, including experiencing denial and termination of employment; denial of needed medical care; loss of insurance coverage; erosion of social support networks; eviction from homes; disruption of family relationships; social isolation; depression; unwarranted criminal prosecution; and excessive criminal sentences." Lambda Legal, *HIV Stigma and Discrimination in the U.S.: An Evidence-Based Report* (Nov. 2010), *at* https://www.lambdalegal.org/sites/default/files/publications/downloads/fs_hiv-stigma-and-discrimination-in-the-us_1.pdf.

[51] U.S. Equal Employment Opportunity Commission (EEOC), *ADA Charge Data by Impairment/Bases – Receipts, FY 1997 – FY 2017*, *at* https://www.eeoc.gov/eeoc/statistics/enforcement/ada-receipts.cfm.

[52] *Id.*

[53] Brad Sears & Deborah Ho, *HIV Discrimination in Health Care Services in Los Angeles County: The Results of Three Testing Studies*, The Williams Institute (Dec. 2006), *at* https://williamsinstitute.law.ucla.edu/wp-content/uploads/Sears-Ho-Discrimination-Health-Care-LA-County-Dec-2006.pdf.

[54] AIDS Law Project (Jun. 1, 2012), *Milton Hershey School to Pay $700,000 to End Complaint Over HIV Discrimination*, *at* http://www.aidslawpa.org/2012/06/abraham-smith-and-mother-smith-v-milton-hershey-school.

states introduced legislation that imposed felony level criminal sanctions to control the behavior of people living with HIV. *Id.* No disease in American history has ever been met with a similarly punitive response from lawmakers. *Id.* ¶12.

> **b.      People living with HIV lack relative political power.**

As a group, people living with HIV lack sufficient political power to protect themselves from enactment of discriminatory measures. There currently are very few openly HIV-positive elected officials at the state level and none at the federal level of which Plaintiffs are aware.[55]

The HIV/AIDS epidemic and the needs of people living with HIV were largely ignored by those in power for years.[56] For many of the reasons underlying the stigma and discrimination experienced by people with HIV at the beginning of the epidemic—namely that the disease was associated with already highly stigmatized communities—securing the attention of those who could have martialed the resources necessary to combat this emerging epidemic was challenging.[57] Quite infamously, President Reagan did not mention "AIDS" in public until 1985, four years after the first cases were discovered and approximately 5,000 Americans had already died.[58] By the time Reagan directly addressed the epidemic in a speech in 1987, almost 50,000 Americans had died.[59] The scant amount of attention and relative inaction of the federal

---

[55] *E.g.*, Benjamin Ryan, *HIV-Positive Politicians and HIV Advocates*, POZ MAGAZINE (Sept. 26, 2016), *at* https://www.poz.com/article/hivpositive-politicians-hiv-advocates; Trenton Straube, *NYC Gets Its First Openly HIV-Positive City Council Speaker*, POZ MAGAZINE (Jan. 4, 2018), *at* https://www.poz.com/article/nyc-gets-first-openly-hivpositive-city-council-speaker.

[56] *E.g.* The Guardian, *The First Lady Who Looked Away: Nancy and the Reagans' Troubling AIDS Legacy* (Mar. 11, 2016), *at* https://www.theguardian.com/us-news/2016/mar/11/nancy-ronald-reagan-aids-crisis-first-lady-legacy.

[57] *Id.*

[58] Richard Lawson, *The Reagan Administration's Unearthed Response to the AIDS Crisis is Chilling*, Vanity Fair (Dec. 1, 2015), *at* https://www.vanityfair.com/news/2015/11/reagan-administration-response-to-aids-crisis.

[59] CDC, *HIV and AIDS – United States, 1981-2000*, 50(21) MMWR Weekly 430 (June 1, 2001), *at* https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5021a2.htm#tab1.

government also played out at state and local levels—even in New York City, which was the epicenter of the epidemic in the United States.[60] It was that apparent lack of concern and the anemic reaction of government officials that led to the creation of the AIDS Coalition To Unleash Power (ACT UP) in 1987.[61] Over several years, ACT UP engaged in a series of well-publicized civil disobedience actions in an effort to secure the attention of political leaders and to get them to take action in the face of the community's relative lack of political power.[62]

While ACT UP was marginally successful in creating some of the changes it sought and funding for HIV/AIDS began to rise—first for research, and eventually for prevention, care and treatment—the domestic epidemic has never received the resources necessary to halt the epidemic. Since 1996, the tools to end the epidemic have been at the disposal of the government.[63] It is well established the treatments that became available at that time not only dramatically improve the health of people living with HIV, but also render those taking them non-infectious. Del Rio Decl. ¶25. But the federal program designed to ensure access to treatment is not adequately funded to cover all of those in need of its services and semi-regularly

---

[60] David France, *The reinvention of radical protest: life on the frontline of the AIDS epidemic*, The Guardian, November 29, 2016, *at* https://www.theguardian.com/society/2016/nov/29/act-up-aids-new-york-spencer-cox (revealing that it took New York City mayor Ed Koch two years to publicly acknowledge the AIDS crisis).
[61] *Id.*
[62] *See, e.g.*, Peter Staley, *In Memory of Jesse Helms, and the Condom on His House*, POZ MAGAZINE (July 8, 2008), *at* https://www.poz.com/blog/in-memory-of-je (ACT UP members covered Senator Helms' house in an inflatable condom reading "Helms is deadlier than a virus").
[63] In 1996, effective antiretroviral treatment became widely available. Del Rio Decl. ¶16. Programs exist at various levels to connect people with HIV to medical care, but those programs are heavily reliant on state and federal funding. *See, e.g.*, Henry J. Kaiser Family Foundation, *The Ryan White HIV/AIDS Program: The Basics* (Feb. 1, 2017), *at* https://www.kff.org/hivaids/fact-sheet/the-ryan-white-hivaids-program-the-basics/ ("[The] Ryan White [Program] is the nation's safety net for people with HIV providing outpatient HIV care and treatment to those without health insurance and filling in coverage gaps.").

experiences shortfalls in meeting the needs of those currently enrolled.[64]

Additionally, for more than a decade, advocates have been attempting to change laws criminalizing people living with HIV but have had very limited success in securing change at the state level. They have successfully modified the laws in only three of the 33 states that have HIV-specific criminal laws, thereby doing little to prevent continued unjust prosecutions under these outdated laws.[65] The limited amount of success people living with HIV have had in this arena is a result of their relative political powerlessness.

Finally, that many people living with HIV choose not to disclose their HIV status publicly reflects the stigma and discrimination that can flow from such a public disclosure and reinforces the insularity of group members. *See United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938) (allowing that "prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities"). That stigma and isolation presents an additional obstacle to exercising political power, as it is hard to organize members of a group unwilling to self-identify.

c.     **HIV is an immutable characteristic.**

Once it has been definitively established that a person is living with HIV, that person

---

[64] The most current federal budget proposal would cut funding for the Ryan White Program by a further $57 million, *See Fiscal Year 2019 Budget in Brief*, Health Res. & Servs. Admin. 2 (2018), *at* https://www.hrsa.gov/sites/default/files/hrsa/about/budget/HRSA-fy-2019-budget-in-brief.pdf.

[65] For example, people living with HIV in Ohio continue to be prosecuted and convicted for engaging in sexual contact without being able to prove disclosure of their HIV status. Intent to transmit and actual transmission or harm of any kind are not required, and the use of condoms or other prophylaxis is not a defense. *See* Ohio Rev. Code Ann. §2903.11 (2016).

never stops having HIV, as there is no available cure.[66] Contemporary treatments are incredibly effective at neutralizing the detrimental effects of HIV, but they do not eradicate the virus completely from the person's body. If a person with HIV were to stop receiving treatment, the person's HIV would return to detectable levels and eventually deteriorate the person's immune system.[67] HIV is therefore an immutable characteristic.

> **d.    People living with HIV contribute to society at the same level as others.**

There is no relationship between a person's HIV-positive status and their ability to perform and contribute to society. Even before the introduction of antiretroviral therapy, the percentage of people living with HIV whose ability to contribute to society was impaired was confined primarily to people in the most advanced stage of the disease. For people with access to modern treatments, there is no impairment of the ability to perform or contribute in any form.

There is not a job in the world that a person living with HIV cannot perform. Even without taking the effect of antiretroviral therapy on the risk of transmission into account, a person living with HIV can perform in any job without presenting a significant risk to the health or safety of herself or others. In the few contexts where there is a persistent (but false) belief that a person living with HIV would present such a risk—*e.g.*, healthcare workers or first responders—the reality is slowly catching up in the jurisprudence.[68]

---

[66] HIV has been eradicated from only one person. *See* NBC News, *How Many People have been Cured of HIV? One* (July 22, 2014), *at* https://www.nbcnews.com/health/health-news/how-many-people-have-been-cured-hiv-one-n161546.

[67] Jeffrey Laurence, *Controlling HIV After Stopping Antiretroviral Therapy*, amfAR (Feb. 13, 2013), *at* http://www.amfar.org/controlling-hiv-after-stopping-antiretroviral-therapy/.

[68] *E.g.*, Consent Decree, *EEOC v. Granite Mesa Health Ctr. Ltd.*, No. 1:16-cv-01113-LY (W.D. Tex. Feb. 18, 2017) (defendant paid nurse $70,000 for wrongfully terminating his employment after learning of his HIV-positive status); San Diego Gay and Lesbian News, *Atlanta to Pay $250k to Man Denied Police Officer Job because of HIV Status* (Aug. 22, 2012), *at* http://sdgln.com/causes/2012/08/22/atlanta-pay-250k-man-denied-police-officer-job-because-hiv-status.

Even before the advent of modern treatments for HIV, people with an AIDS diagnosis would be the only group likely to experience the type of physical limitations that could affect their ability to work.[69] But given the long latency period for HIV, people with an AIDS diagnosis have always been a relatively small part of the overall population living with HIV.[70] Now that effective HIV treatments are available, significantly fewer people with HIV also have an AIDS diagnosis—and even fewer people with HIV are unable to work.

New scientific technologies have also eliminated limitations on a person's ability to contribute to society through reproduction while living with HIV. For women, HIV medications provided during childbirth all but eliminate the risk of mother-to-child transmission.[71] For men, a procedure known as "sperm-washing" was developed to allow them to fertilize an egg in an assisted reproduction process.[72] And today, both men and women living with HIV who have a suppressed viral load are able to engage in reproduction through sexual intercourse.[73] There is no longer any significant limitation on a person with HIV's ability to contribute to society by having

---

[69] Even for people with an AIDS diagnosis, physical limitations were due to the debilitating effects of certain opportunistic infections rather than the virus's presence in the blood. *See*, *e.g.*, Office of the Assistant Sec'y of Def., Health Affairs Policy Mem. – Human Immunodeficiency Virus Interval Testing (Mar. 29, 2004), *at* https://www.health.mil/Reference-Center/Policies/2004/03/29/Policy-Memorandum---Human-Immunodeficiency-Virus-Interval-Testing ("there is no evidence that HIV infection, per se, affects physical fitness").

[70] *See* CDC, *HIV in the United States: At a Glance* (June 26, 2018), *at* https://www.cdc.gov/hiv/statistics/overview/ataglance.html (of over one million people living with HIV in the United States, only 18,000 received an AIDS diagnosis in 2016).

[71] CDC, *Pregnant Women, Infants, and Children*, (August 28, 2017), *at* https://www.cdc.gov/hiv/group/gender/pregnantwomen/emct.html.

[72] WHO, *How effective and safe is semen washing for HIV-serodiscordant couples?* (last visited July 15, 2018), *at* http://www.euro.who.int/en/data-and-evidence/evidence-informed-policy-making/publications/hen-summaries-of-network-members-reports/how-effective-and-safe-is-semen-washing-for-hiv-serodiscordant-couples.

[73] Roger Peabody, *NICE says sperm washing is no safer than effective treatment and timed intercourse*, NAM AIDSMap (May 22, 2012), *at* http://www.aidsmap.com/NICE-says-sperm-washing-is-no-safer-than-effective-treatment-and-timed-intercourse/page/2364056/.

and raising children. People living with HIV are fully contributing members of society.

      **e.**      **Applying Heightened Scrutiny To Policies Targeting People Living With HIV Is Consistent with *City of Cleburne v. Cleburne Living Center*.**

In *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985), the Supreme Court held that a city's zoning ordinance impermissibly discriminated against people with mental disabilities. *Cleburne* is often cited for the proposition that regulations targeting people with disabilities, including people living with HIV, are subject only to rational basis review. *See*, *e.g.*, *Doe v. Univ. of Md. Med. Sys. Corp.,* 50 F.3d 1261, 1267 (4th Cir. 1995). However, *Cleburne*, which determined the appropriate standard of review for classifications based on mental disabilities, should not control the level of scrutiny applied to people living with HIV. The principal factor that led the court to apply rational basis to a mental disability classification in *Cleburne*—the relative inability to perform and contribute to society as others—simply is not present with respect to people living with HIV. In large part for this reason, people living with HIV do not fit easily within any standardized definition of people with disabilities.

In stark contrast to *Cleburne's* view of the classification at issue in that case, the health status of people living with HIV has no significant impact on their ability to contribute to society. *See* §IV.A(1)(d), *supra*. In *Cleburne,* the Court stated that it was "undeniable . . . that those who are mentally retarded (*sic*) have a reduced ability to cope with and function in the everyday world." *Cleburne*, 473 U.S. at 442*.* That is simply not true for people living with HIV. *See* §IV.A(1)(d), *supra*. The *Cleburne* Court's justification for rejecting rational basis review is not present for the group of people whose rights are at issue here.

Furthermore, in *Cleburne* the Court noted that people with mental disabilities were a "large and diversified group" across a wide spectrum of disability, requiring flexibility for lawmakers adequately to address their varying needs. *See id.* at 442-43. On the other hand,

people living with HIV are, except for a small minority, uniformly capable of contributing to society. *See* §IV.A.(1)(c), *supra*; *see also Frontiero v. Richardson*, 411 U.S. 677 (1973) (holding that gender is entitled to heightened scrutiny because it *frequently*—not always—bears no relation to the ability to perform or contribute to society). People with HIV work and live among us unnoticed because their ability to perform in these tasks is not in any way limited by their HIV. They are entitled to heightened scrutiny because of the animus, stigma and discrimination they experience based on other people's outdated *misperceptions* about HIV. *E.g., Cleburne*, 473 U.S. at 441 (noting that sex-based classifications "very likely reflect outmoded notions of the relative capabilities of men and women").

Indeed, most people living with HIV do not fit within any common definition of "disabled." There is not a single legal definition of disability under federal law, much less a definition that has been established for purposes of engaging in an equal protection analysis. For instance, the definition of "disability" that qualifies a person for disability benefits under the Social Security Act is much different—and narrower—than the definition that qualifies a person as an individual with a disability under the Americans with Disabilities Act ("ADA"). *Compare* 42 U.S.C. §1382c(a)(3)(A) *with* 42 U.S.C. §12102(1)(A). Furthermore, successful treatment with antiretroviral therapy moves people with HIV even further away from any traditional definition of a person with a disability.[74] *See* §§II.A., IV.A.(1)(d), *supra*.

---

[74] In fact, when the ADA was amended in 2009, "immune function" was explicitly added to the list of major life activities—the substantial impairment of which would lead to a finding of disability under the ADA—because plaintiffs proceeding under the statute were finding it increasingly difficult to demonstrate that any of the previously recognized major life activities were substantially impaired by their HIV. *See* Andrew J. Gordon, *End Around: HIV Discrimination in the Post-Amendments Act Workplace*, 36 Berkeley J. Emp. & Lab. L. 215, 219 (2015); *see, e.g.*, *Worster v. Carlson Wagon Lit Travel, Inc.*, 353 F.Supp.2d 257, 266 (D. Conn. 2005) (holding that plaintiff was not disabled under the ADA because his HIV status did not substantially impair any major life activities).

For purposes of assessing whether people living with HIV are entitled to heightened scrutiny in an equal protection analysis, it is most appropriate to characterize them as people with a stigmatized health condition—a trait they all share—rather than as people with a disability, a characterization into which only a small percentage of the group may fit depending on the definition applied. Rather than a rote application of *Cleburne* to determine the level of scrutiny,[75] this Court should evaluate from a clean slate whether people with a stigmatized health condition—and more specifically, people living with HIV—constitute a suspect or quasi-suspect class entitled to heightened scrutiny. In assessing the relevant factors from that perspective, it becomes apparent that people living with HIV are entitled to at least intermediate scrutiny.

### 2. The Military's Restrictions on Military Service for People Living with HIV Are Not Even Rationally Related to Military Effectiveness.

Plaintiffs are likely to succeed in demonstrating the military's restrictions on service for HIV-positive individuals do not survive even rational basis review, much less heightened scrutiny. Under even the lowest level of review, a law must bear a rational relationship to a legitimate government interest to be valid. *See, e.g., U.S. Dep't of Agric. v. Moreno*, 413, U.S. 528, 534 (1973). This standard is "not a toothless one." *Mathews v. Lucas*, 427 U.S. 495, 533 (1976). Because of advances in the treatment of HIV, there is no longer a rational relationship between the military's restrictions on service members with HIV and any legitimate government interest related to military effectiveness, readiness, lethality, or other purported justification.

---

[75] *See, e.g., Doe v. City of Chicago,* 883 F.Supp. 1126, 1140-41 (7th Cir. 1994) (applying *Cleburne* with little discussion to hold that classifications based on HIV-positive status are entitled only to rational basis review); *Contractors Ass'n of Eastern Pennsylvania, Inc. v. City of Philadelphia*, 6 F.3d 990, 1001 (3d Cir. 1993) (same); *Leckelt v. Board of Com'rs of Hosp. Dist. No. 1,* 714 F. Supp. 1377, 1390 (E.D. La. 1989) (same).

a.      **A Soldier's HIV Diagnosis Bears No Relationship to His or Her Fitness, Military Readiness, Effectiveness, or Lethality.**

The military's restrictions are not rationally related to military effectiveness or readiness,[76] because a person's physical capabilities are not affected by an HIV diagnosis. Prior to the availability of antiretroviral therapy in 1996, physical limitations would likely develop once an individual was diagnosed with AIDS. Now, however, someone who receives treatment will not experience physical limitations. *See* Hendrix Decl. ¶¶ 26-27 (Ex. E). As a military publication has explained: "In the past 30 years, HIV-1 infection has gone from an untreatable disease marked by inexorable clinical progression through extreme debility to death to a treatable disease that is compatible with active service throughout a full career in the U.S. military."[77] Even the DoD admitted over a decade ago that "[t]here is no evidence that HIV infection, per se, affects physical fitness."[78]

Sgt. Harrison exemplifies that an HIV diagnosis has no impact on physical abilities. After being diagnosed with HIV, Sgt. Harrison immediately began treatment and shortly thereafter had an undetectable viral load. *See* Harrison Decl. ¶13. Sgt. Harrison has been virally suppressed or had an undetectable viral load since that time. *Id.* ¶14. Three years after his diagnosis, Sgt. Harrison received the highest possible score for "medical fitness" when he underwent his

---

[76] AR 600-110 indicates that the Army's HIV policy reflects "the effect of infected personnel on unit functions and readiness." AR 600-110 at Ch. 1, § III, ¶1-15.

[77] J. Brundage, D. Hunt & L. Clark, *Durations of Military Service after Diagnoses of HIV-1 Infections Among Active Component Members of the U.S. Armed Forces 1990-2013*, Armed Forces Health Surveillance Center, *Medical Surveillance Monthly Report*, Vol. 22, No. 8 (Aug. 2015), *at* https://health.mil/Reference-Center/Reports/2015/01/01/Medical-Surveillance-Monthly-Report-Volume-22-Number-8.

[78] Office of the Assistant Sec'y of Def., Health Affairs Policy Mem. – Human Immunodeficiency Virus Interval Testing (Mar. 29, 2004), *at* https://www.health.mil/Reference-Center/Policies/2004/03/29/Policy-Memorandum---Human-Immunodeficiency-Virus-Interval-Testing.

commissioning medical exam. *Id.* ¶14; Hendrix Decl. ¶26. In other words, Sgt. Harrison's HIV

has not impacted his physical abilities and fitness to serve.

      **b.**    **Soldiers Living with HIV Who Are Deployed Can Easily Be Provided with Necessary Medical Care.**

The military's purported concerns regarding the risks posed to service members with HIV

while deployed are unfounded given current capabilities for medically managing HIV. Medical

care for people living with HIV has changed dramatically since the Army first imposed its HIV-

related restrictions back in 1988.[79] Effective treatment became widely-available in 1996, and

today HIV medications generally consist of a single tablet regimen (STR), "which is literally one

pill taken once a day." Hendrix Decl. ¶23. This is no different from the prescription medication

service members serving oversees must take to prevent malaria, as Sgt. Harrison did when he

was deployed in Afghanistan (Harrison Decl. ¶8). Nor is it different from the medication that

those with dyslipidemia—who are permitted to enlist and deploy per current military policies—

must take daily.[80]

Medical monitoring of HIV-positive individuals has also advanced to the point that there

is no longer any HIV-related risk to personnel with HIV serving and deploying. Viral load

testing generally is required only 2-3 times per year. *See* Hendrix Decl. ¶24. This testing is

routine and entails drawing and testing a blood sample. *Id.* When testing facilities are not

available in theater, blood samples may be shipped to a lab. *Id.* But point-of-care viral load

testing that is cost-effective and returns results within 90 minutes is also becoming increasingly

available. *Id.*

---

[79] AR 600-110 (Mar. 11, 1988), *at* http://www.whs.mil/library/mildoc/AR%20600-110,%2011%20March%201988.pdf.
[80] *See* DoDI 6130.03, *Medical Standards for Appointment, Enlistment, or Induction in the Military Services*, Encl. 4, § 5.24(n), p. 39 (eff. May 6, 2018).

In addition, the on-site care of people living with HIV who have a suppressed viral load is relatively minimal, and physicians in the Armed Forces can provide the requisite level of care for individuals with HIV, regardless of where they are stationed. *Id.* ¶25. In the unusual event that on-site medical personnel do not feel capable of providing the necessary care, an infectious disease specialist may consult via telemedicine. *Id.* In sum, individuals with HIV who receive treatment are not at any greater risk than and can access care in a manner similar to other individuals serving in the military.

The health care costs for individuals with HIV who wish to serve in the Armed Forces are also not a legitimate basis for the military's discriminatory policies. For decades, the military has borne the costs of testing service members and covering the care of service members who have been diagnosed with HIV while on active duty. Moreover, the federal government has the leverage to negotiate the price of medications to keep down costs. Finally, costs alone are an insufficient reason to justify discriminatory policies that otherwise represent a clear violation of equal protection. The government may not "protect the public fisc by drawing an invidious distinction between classes" of persons. *Mem. Hosp. v. Maricopa Cty.*, 415 U.S. 250, 263 (1974).

    **c.**      **Other Purported Justifications for Restrictions on Military Service for HIV-Positive Individuals Do Not Pass Muster.**

If the military maintains that its policies barring individuals from enlisting or deploying overseas are related to preventing battlefield transmissions or protecting the safety of blood supplies,[81] given the current knowledge regarding transmission and treatment of HIV, Plaintiffs are overwhelmingly likely to show that these justifications also lack merit. As an initial matter, to date there is no documented evidence of a battlefield transmission. Hendrix Decl. ¶21.

---

[81] *See* AR 600-110 at Ch. 1, § III, ¶1-15.

Moreover, given the known effect of a suppressed or undetectable viral load on sexual transmission risk, there is an "extremely low—and possibly only theoretical—risk of transmission via blood splash and other non-injection activities." Del Rio Decl. ¶27. In the highly unlikely event that such an exposure occurred, post-exposure prophylaxis could be administered, further decreasing whatever minimal risk of exposure existed. Hendrix Decl. ¶22. As a result, there is no basis to conclude that someone with HIV would present a danger to other military personnel. *Id.*

Allowing individuals with HIV to serve and deploy overseas also does not jeopardize the safety of military blood supplies. People living with HIV are instructed not to act as blood donors and any risk to blood supplies from those who are unaware they have HIV would remain constant. Hendrix Decl. ¶30. Eliminating the military's discriminatory HIV-related policies will have no impact on the so-called "walking blood bank," *i.e.*, donations from service members in emergency situations. Emergency battlefield transfusions are relatively rare. *Id.* ¶31 n.31. As it currently stands, not all service members can serve as donors, given that "various other factors that often disqualify individuals as emergency blood donors, such as blood type—making people living with HIV no different from these other groups who are allowed to serve and deploy." *Id.* Furthermore, in the future, the availability of blood substitutes should also diminish the military's need to rely on the "walking blood bank." *Id.*

The fact the military has not only permitted HIV-positive individuals to continue to serve but also has allowed them to serve outside the United States entirely refutes the notion there is any real risk to HIV-positive individuals or others resulting from their service overseas. In 2012, the DoD explained to Congress: "[B]ased on advances in medical treatment which have significantly simplified the disease management of individuals with HIV," the Navy began

permitting individuals with HIV to deploy outside the United States.[82] This updated policy was based the Navy's assessment there is "no demonstrated risk" of transmission in normal daily activities and its recognition that an investment had been made in individuals already serving in the military.[83] As of September 2017, approximately 55 sailors have been assigned to various overseas and/or operational assignments without any adverse events.[84]

**B.      Plaintiff and Other HIV-Positive Service Members Will Be Irreparably Harmed Absent a Preliminary Injunction.**

Implementation of the new DOGO Policy is likely to result in the discharge of almost all service members living with HIV. This would abruptly end the military careers of hundreds of service members across all branches of the Armed Forces. Without a preliminary injunction, Sgt. Harrison and hundreds of other HIV-positive service members will be irreparably harmed.

The DOGO Policy *requires* the branches of the military to begin processing and discharging members who fall within its parameters by October 2018, but it allows them to start doing so immediately.[85] Already, multiple individuals with HIV are facing discharge proceedings or service restrictions as a result of the DOGO Policy.[86]

---

[82] Dep't of Def., *Report to Congressional Defense Committees on Department of Defense Personnel Policies Regarding Members of the Armed Forces with HIV or Hepatitis B*, at 7 (July 30, 2014), *at* https://health.mil/Reference-Center/Reports/2014/09/22/DoD-Personnel-Policies-Regarding-Members-of-the-Armed-Forces-with-HIV-or-Hepatitis-B
[83] SECNAV Instruction 5300.30E, ch. 9.b. (Aug. 13, 2012).
[84] J. Okulicz, *et al.*, *Review of the U.S. Military's Human Immunodeficiency Virus Program: A Legacy of Progress and a Future of Promise*, Armed Forces Health Surveillance Ctr., *Medical Surveillance Monthly Report*, Vol. 24, No. 9 (Sept. 2017), *at* https://health.mil/Reference-Center/Reports/2017/01/01/Medical-Surveillance-Monthly-Report-Volume-24-Number-9.
[85] Wilkie, DOGO Policy, *supra,* at n.1.
[86] *See* Declarant 2 Decl. ¶ 12 ("In spite of the recommendations of both my doctor and my commanding officer, the informal [Physical Examination Board] decided . . . I should nevertheless be discharged.") (Ex. G); Declarant 1 Decl. ¶¶ 12-13 ("[M]y selection as Commander of the Fifth Brigade had been withdrawn. As justification, my superiors indicated their decision was a result of the Department of Defense Retention [DOGO] Policy for Non-Deployable Service Members . . . , which had been issued on February 14, 2018.") (Ex. F).

Prior to issuance of the DOGO Policy, service members living with HIV who were found to be fit for duty were nonetheless permitted to continue serving "in a manner that ensures access to appropriate medical care."[87] Now, due to the DOGO Policy, hundreds of service members living with HIV will be involuntarily separated from the military, where many proudly have served for decades. For example, Sgt. Harrison has served his country for nearly 18 years, earned a law degree, passed a bar examination, and is otherwise qualified to serve as a Judge Advocate General. Yet he is being prevented from doing so by military policies regarding the accession and non-deployability of service members with HIV, and he could be separated from service under the new DOGO Policy before this case is even adjudicated. Hundreds of other service members with HIV would likewise be denied the opportunity to continue and advance their military careers. *See Ariz. Dream Act Coalition v. Brewer*, 855 F.3d 957, 977 (9th Cir. 2017) ("[L]oss of opportunity to pursue one's chosen profession constitutes irreparable harm").

Furthermore, "[t]he unconstitutional discharge of even one service member perpetuates a harm to that person that is irreparable." *Log Cabin Republicans v. United States*, 2012 WL 12952732, at *10 (C.D. Cal. Mar. 15, 2012), *vac'd on other grounds*; Declarant 2 Decl. ¶23. Individuals who are discharged from military service stand to lose medical benefits and a portion of their retirement pay. *See Elzie v. Aspin*, 841 F.Supp. 439, 443 (D.D.C. 1993). The deprivation of medical benefits "is exactly the sort of irreparable harm that preliminary injunctions are designed to address." *Fishman v. Paolucci*, 628 F. App'x. 797, 801 (2d Cir. 2015).

In addition to the tangible harms discussed above, the stigma suffered by Plaintiffs in being separated from the military is an irreparable harm that warrants a preliminary injunction. Courts have recognized that there is a certain "stigma of being removed from active duty." *Elzie*

---

[87] *See* DoDI 6485.01 (Jun. 7, 2013).

*v. Aspin*, 841 F.Supp. 439, 443 (D.D.C. 1993); *see also* Declarant 1 Decl. ¶16 (discussing stigma of being denied his promotion at the last minute). This is especially so when that removal is not due to any fault of those being discharged. Additionally, the violation of constitutional rights "unquestionably constitutes irreparable injury." *See Elrod v. Burns*, 427 U.S. 347, 374 (1976). The DOGO Policy and pre-existing military policies create a regime in which otherwise qualified, HIV-positive service members are prohibited from serving in any capacity in the military. This policy "stigmatizes members of a disfavored group as innately inferior." *Evancho v. Pine-Richland School District*, 237 F.Supp.3d 267, 294 (W.D. Pa. 2017) (citing *Heckler v. Mathews*, 465 U.S. 728, 739 (1984)).

### C.    The Balance of Equities Weigh in Favor of Plaintiffs

The balance of equities plainly weighs in favor of granting the requested relief. Government "is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Aziz v. Trump*, 234 F.Supp.3d 724, 737 (E.D. Va. 2017); *see also Centro Tepeyac v. Montgomery Cty.,* 722 F.3d 184, 192 (4th Cir. 2013) (citing *Doran v. Salem Inn., Inc.*, 422 U.S. 922, 934 (1975)). Because Plaintiffs are likely to succeed in the constitutional challenges to the DOGO Policy and the underlying policies regarding HIV, the government cannot claim to be harmed by being forced to cease its unconstitutional actions.

Furthermore, the government cannot point to any significant harm it would suffer from an injunction. As of June 2017, there were 1,194 service members with HIV in the military.[88] This number accounts for 0.4% of the 286,000 service members who are nondeployable and just

---

[88] *See* DoD, *Update: Routine Screening for Antibodies to Human Immunodeficiency Virus, Civilian Applicants for U.S. Military Service and U.S. Armed Forces, Active and Reserve Components,* (Jan. 2012–Jun. 2017), 24 Med. Surveillance Monthly Rpt. 8, 8–14 (Sept. 2017).

.027% of all active duty service members.[89] *See* Hendrix Decl. ¶ 31. Plaintiffs simply ask the Court to return people living with HIV to the status quo that existed prior to issuance of the DOGO Policy. This creates no burden on the government, as the policy of allowing service members with HIV to serve as long as they are fit for duty dates back over two decades to 1993.

### D.   The Public Interest Favors an Injunction

As this Circuit and Court have made clear, "upholding constitutional rights surely serves the public interest." *Aziz*, 234 F.Supp.3d at 738; *see also Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). The public interest is also served by preventing discrimination based solely on HIV status as a principle of justice, permitting dedicated soldiers to continue serving their country and receive adequate medical care, while awaiting a decision on the merits.

In addition, there is a significant public health interest in demonstrating to the broader public—particularly those at higher risk for HIV—that they will not face stigma or discrimination if they seek testing and treatment for HIV. The CDC has indicated that "[m]ore than three decades after the first HIV diagnoses were made, stigma remains a barrier to addressing HIV in the United States."[90] The issuance of a preliminary injunction to prevent continuing discrimination against people living with HIV will enhance efforts to educate the public about HIV transmission, prevention, and treatment.

## V.   CONCLUSION

For the reasons set forth above, Plaintiffs are entitled to an injunction maintaining the status quo and suspending implementation of the DOGO Policy against people living with HIV.

---

[89] *See* Ferdinando, *supra*.
[90] *See* CDC, *Act Against AIDS*, *at*
https://www.cdc.gov/actagainstaids/campaigns/lsht/index.html.

Dated:  July 19, 2018

 /s/ *Scott A. Schoettes*
Scott A. Schoettes*
SSchoettes@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
105 W. Adams, Suite 2600
Chicago, IL 60603
T: (312) 663-4413

Anthony Pinggera*
APinggera@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
4221 Wilshire Blvd, Suite 280
Los Angeles, CA 90010
T: (213) 382-7600

Peter E. Perkowski*
PeterP@outserve.org
OUTSERVE-SLDN, INC.
P.O. Box 65301
Washington, DC 20035-5301
T: (800) 538-7418

 /s/ *Andrew R. Sommer*
Andrew R. Sommer
Virginia State Bar No. 70304
ASommer@winston.com
Cyrus T. Frelinghuysen*
CFrelinghuysen@winston.com
John W.H. Harding
Virginia State Bar No. 87602
JWHarding@winston.com
WINSTON & STRAWN LLP
1700 K St., NW
Washington, DC 20006
T: (202) 282-5000

* motion for *pro hac vice* admission pending

# CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of July 2018, I served a true and correct copy of the

foregoing by first class mail on the following:

James Mattis
Secretary of Defense
1000 Defense Pentagon
Washington, D.C.  20301-1000

Mr. G. Zachary Terwilliger
U.S. Attorney for the Eastern District of Virginia
Justin W. Williams U.S. Attorney Building
2100 Jamieson Avenue
Alexandria, VA 22314

U.S. Department of Defense
1000 Defense Pentagon
Washington, D.C. 20301-1000

Dr. Mark T. Esper
Secretary of the Army
101 Army Pentagon
20310-0101

Mr. Jeff Sessions
Attorney General of the United States
Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C.  20530-0001

Dated:  July 19, 2018                    Respectfully submitted,

                                         /s/ *Andrew R. Sommer*
                                         Andrew R. Sommer